FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ SEP 0 2 2009 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANDREA KANTOR,

                Plaintiff,

        - against -

1-800-FLOWERS.COM, INC.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

09 Civ.

09 3800

COMPLAINT

PLAINTIFF DEMANDS A
TRIAL BY JURY

BLOCK, J.

Plaintiff Andrea Kantor ("plaintiff" or "Kantor"), through her attorneys Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendant 1-800-Flowers.com, Inc. ("defendant" or "1-800-Flowers"), as follows:

NATURE OF THE ACTION

1.    Plaintiff brings this action to remedy sex discrimination in employment and to remedy retaliation for her opposition to such unlawful employment actions, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); and the New York State Human Rights Law, Executive Law § 296 et seq. (the "Executive Law").

2.    Plaintiff seeks injunctive and declaratory relief, damages, and other legal and equitable relief pursuant to Title VII and the Executive Law.

JURISDICTION AND VENUE

3.    The Court has jurisdiction over plaintiff's Title VII claim pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331.

4.     The Court has supplemental jurisdiction over plaintiff's Executive Law claims pursuant to 28 U.S.C. § 1367.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Eastern District of New York.

6.     Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against defendant on December 15, 2008, complaining of the acts of discrimination and retaliation alleged herein.  On or about June 17, 2009, without making a determination, the EEOC issued plaintiff a notice of right to sue.  Plaintiff has complied fully with the administrative prerequisites of Title VII.

## PARTIES

7.     Plaintiff is a female resident of New York City.  She was employed at defendant's headquarters in Carle Place, New York until the termination of her employment in August 2008.

8.     Defendant is a Delaware corporation with its principal place of business in Carle Place, New York.  Defendant is an employer within the meaning of the Title VII and the Executive Law.

## FACTUAL ALLEGATIONS

9.     1-800-Flowers is a retail provider of gifts, including flowers, gift baskets, plants, home décor, garden and gourmet items.  Customers purchase its products online at its website, www.1800flowers.com, as well as via telephone, or by visiting retail stores.  It has expanded its product offerings to include gourmet foods, jewelry and gifts for home and garden. The Company's collection of brands includes Plow & Hearth, Problem Solvers, Wind & Weather, Madison Places, HearthSong, Magic Cabin, The Popcorn Factory, Cheryl & Co.,

261045 v1

Fannie May, Harry London, GreatFood.com, Ambrosia.com, 1-800-BASKETS.COM and the BloomNet international floral wire service.

10.     Prior to joining 1-800-Flowers, Kantor had a long and distinguished career in corporate and securities law.  From 1984 through 1988, she worked at Brown & Wood and Schulte Roth and Zabel.  Kantor worked for more than 16 years for GP Strategies Corporation ("GP Strategies"), a NYSE-listed global performance improvement solutions provider to Fortune 500 companies.  At GP Strategies, Kantor was promoted from Associate General Counsel to Vice President, Corporate Counsel and then to Executive Vice President, General Counsel.  She was responsible for, among other things, preparing and filing all reports required under federal securities laws and NYSE and NASDAQ regulations, mergers and acquisition transactions, and advising the board of directors on compliance with Sarbanes-Oxley and corporate governance issues.  When GP Strategies decided to move its offices to Maryland, Kantor chose to stay in New York and join 1-800-Flowers.

11.     Kantor joined 1-800-Flowers in January 2007 as Deputy General Counsel and Vice President.  She reported directly to Gerard Gallagher ("Gallagher"), General Counsel and Senior Vice President of Business Affairs.  Gallagher is also a founding partner of the law firm, Gallagher, Walker, Bianco and Plasteras (the "Gallagher Firm").   Tom Plasteras ("Plasteras"), another partner at that firm, works at 1-800-Flowers approximately three days a week.  His primary duties include litigation, real estate, and human resource matters.  Jon Kramer ("Kramer"), an associate with the Gallagher Firm, also works at 1-800-Flowers approximately two days a week.  Mike Sparling ("Sparling") was the only other full-time attorney in the defendant's legal department.   He has worked for 1-800-Flowers for

approximately 15 years. His primary duties include trademark filings and basic contract work. Gallagher and other senior executives frequently criticized Sparling's performance.

12.     Upon information and belief, Kantor was the first female attorney to work in the 1-800-Flowers' legal department. At the time of Kantor's firing, Gallagher's law firm did not employ any female attorneys.

13.     Throughout her tenure, Kantor worked hard in fulfilling her responsibilities for all corporate and securities matters for 1-800-Flowers and its brands. She successfully negotiated, structured and drafted a licensing and promotion agreement for the Martha Stewart 1-800-Flowers partnership and actively participated in all legal and strategic matters relating to its launch. She also worked on and negotiated a new e-commerce platform with IBM; enterprise-wide gift card and rewards programs; venture capital transactions; significant and complex IT matters, including a critical transaction with Oracle in May 2008; and various other important enterprise-wide agreements. In January 2008, defendant recognized her significant contributions by providing her 2,000 restricted shares of common stock that were given only to the 1-800-Flowers' "top talent."

14.     Since the beginning of Kantor's employment, Gallagher prevented her from becoming fully integrated into the legal department. For example, he did not hold department meetings until six or eight months into her tenure, and preferred to meet individually with the male attorneys. He also frequently ignored Kantor's questions, emails, and telephone calls, and would frequently disappear from the office without explanation. When he answered her emails, Gallagher often responded in a demeaning or sarcastic way.

15.     From the outset of her employment with 1-800-Flowers, Kantor consistently reported Gallagher's lack of communication to Jan Dinerstein ("Dinerstein"), an

executive recruiter who was involved in her hiring and was on retainer to defendant as a consultant, and to Maureen Paradine ("Paradine"), Vice President of Human Resources at 1-800-Flowers. Kantor also frequently reported to Paradine and Dinerstein the lack of cooperation she received from the members of the legal department, who were all men. In fact, Kantor met and/or spoke almost weekly with Dinerstein during the first year of her employment. When Gallagher saw Kantor with Dinerstein, he often asked, "Are you girls conspiring against me?"

16.    In January 2007, Kantor suggested to Gallagher that they go out to lunch together on a weekly or bi-weekly basis. In response, Gallagher told her that she was "annoying" him by referring to the need for increased communication and said, "You remind me of my wife."

17.    Throughout Kantor's employment at 1-800-Flowers, Gallagher made other sex-biased comments to her and other women in the legal department:

   a.   Gallagher frequently yelled to Audrey Moeschen ("Moeschen"), the legal administrative assistant, by saying "Audrey, come to Jerry boy!"

   b.   In April 2007 when Kantor's mother visited the office and Kantor introduced her to Gallagher, he said, "Andrea makes and gets a good cup of coffee."

   c.   Gallagher repeatedly referred to Kantor, and other women in the department as "babe."

   d.   In February or March 2007, in response to a laudatory email about Kantor's performance from David Siegel, the Vice President of Business Development, Gallagher wrote: "It is amazing what $5 buys these days."

e. After Kantor reported to Paradine a derogatory email Gallagher sent her on June 20, 2008, Gallagher asked Kantor, "How would you like it if I went running to H[uman] R[esources];" he told Kantor he resented her discussions with Paradine and viewed any such discussions as disloyal to him and to the legal department.

f. During the preparation of the 1-800-Flowers' proxy statement for which Paradine helped review the executive compensation disclosure, Bill Shea ("Shea"), the Chief Financial Officer, and Gallagher remarked about Paradine, "Don't expect anything from her; she's a princess."

18.    In addition to making sex-biased comments, Gallagher treated Kantor differently than he treated the male attorneys in the office. Gallagher frequently commented about what he thought was a problem with Kantor's punctuality.  However, Kantor typically arrived to work at the same time as male employees.  Occasionally, she arrived to work later than usual because of doctor's appointments, childcare needs, or as a result of having worked very late the prior evening.  Kantor was a single mother and commuted to Carle Place from Manhattan, a 40 mile commute.  On the occasions in which she was late, she always made sure to alert Gallagher (unless he was unreachable, in which case she alerted Moeschen) and all clients that she was available via cell phone and BlackBerry.  Kantor always checked her voicemails and constantly reviewed her BlackBerry for any messages.  Her occasional lateness did not affect her work.  She never missed a deadline, a meeting, or a conference call and was regularly complimented on her quick turn around time, professionalism and excellent work product.

19.   Male employees were often out of the office during business hours playing golf, at the gym, or working from home several days a week. These male attorneys and other male employees were frequently unreachable and unresponsive, whereas Kantor stayed at work late into the evening whenever necessary, always promptly responded to emails and voice mails, and often made herself available outside of business hours.

20.   Unlike the male attorneys such as Plasteras, Kantor was rarely provided with any administrative assistance. She typed all of her own documents, but occasionally needed some formatting assistance on certain complicated drafts for critical matters. When Kantor asked for assistance from Moeschen, the legal administrative assistant, Moeschen said that she would be reprimanded if Gallagher saw her helping Kantor since she was permitted to assist only Gallagher and Plasteras.

21.   In addition to being subjected to differential treatment with regard to work hours and administrative assistance, Kantor was generally excluded from the quarterly board of directors meetings and other important meetings. Gallagher never introduced her to any board members and prohibited any direct communication between Kantor and members of the board.

22.   Only after Dinerstein spoke directly to Chris McCann, President of 1-800-Flowers, about the need for Kantor's legal expertise was Kantor permitted to attend the senior management quarterly meetings convened to discuss the earnings press release and script. Kantor was the only female of the attendees and was subjected to offensive comments. At one meeting, Jim McCann, the Chief Executive Officer, asked Joe Pititto ("Pititto"), head of investor relations, why his shirt was not freshly pressed. Pititto replied, "I made the mistake of asking my wife what she does all day." All the men had a chuckle about this incident and discussed the implications of this remark for Pititto's sex life. Prior to each meeting or document review,

Gallagher warned Kantor to keep her "comments to a minimum" so as not to "offend" anyone and remarked that the Accounting/Finance personnel were all "good Catholic boys." During and following each meeting, Kantor provided substantial feedback on the press release and script. However, she was often excluded from the follow-up meetings. Kantor told Gallagher that if she were a man, she would have been told when the meetings were to be held or rescheduled and that she certainly would have been treated more respectfully.

23.    Gallagher also excluded Kantor from doing work in areas of law in which she had substantial experience. Despite her specifically and repeatedly requesting assignments in the mergers and acquisitions area, Gallagher usually either worked on these matters himself or gave that work to Cahill Gordon & Reindl, L.L.P. ("Cahill"), the outside law firm that 1-800-Flowers retained. Rather than giving Kantor the opportunity to use her legal skills, Gallagher chose to pay outside counsel to do the work even though senior management had instructed Gallagher to reduce costs.

24.    Kantor worked on the Martha Stewart transaction for over a year with Monica Woo ("Woo"), the President of the Consumer Floral Brand, the defendant's largest and most important business unit. In an email to Kantor, Woo described how at a meeting Jim McCann had chosen to honor Gallagher at the Martha Stewart NASDAQ launch event. When questioned about his selection of Gallagher, Jim McCann informed Woo's team that Gallagher was legally responsible for the Martha Stewart transaction. Woo's team members informed Jim McCann that Kantor had legal responsibility for the Martha Stewart transaction and should be honored with a position on the podium at NASDAQ. However, he insisted that if Gallagher was not on the podium then he would substitute Leslie Convey ("Convey"), a young, attractive business development person. Woo and her team questioned Jim McCann as to why Convey

should be honored at an event related to the Martha Stewart transaction since Convey had not worked on it, and had never worked for the Consumer Floral Brand. It was only after Woo's intervention that Kantor was invited to attend the event. However, Kantor was not invited to participate with the other 1-800-Flowers employees "ringing the NASDAQ bell" or given a position of honor on the podium, although she had worked diligently and successfully on that deal. Woo wrote in an email to Kantor, "Is it a boys' club or what?"

25.     Kantor later learned that Woo had complained to Jim McCann that Woo was being pushed out of the Company because of sex discrimination.

26.     Gallagher told Kantor that he knew Woo had sent her an email describing 1-800-Flowers as a "boys' club." He told Kantor that she should have given him Woo's email immediately. Kantor told him that she believed that 1-800-Flowers was a "boys' club" and that she had promptly reported Woo's claim to Paradine and Dinerstein. Kantor told him she did not give him the email because she was afraid of retaliation.

27.     Three days later on May 16, 2008, 1-800-Flowers internally announced that Woo "is no longer working for the Company" and publicly announced the termination of Woo's employment on May 21, 2008. Upon information and belief, 1-800-Flowers fired Woo.

28.     In June 2008, Kantor again approached Gallagher about getting opportunities to work on mergers and acquisitions. She told him she could handle such legal matters so that 1-800-Flowers would not have to pay Cahill, its outside law firm. Several days later, Gallagher sent Kantor an email asking her what legal work she was referring to when she mentioned Cahill. Kantor replied that she was referring to mergers and acquisition activity, such as the recently completed Design Pac transaction, as well as to securities work, such as filing with the SEC a Form 8-K that was required to document Woo's departure. Gallagher had

assigned the 8-K filing to Plasteras, a male partner at his firm who had no securities law experience.

29.     Plasteras told Kantor that because of her purported conflict of interest, he was handling with Cahill the filing of the Form 8-K concerning Woo and that Kantor would be fired if she had any communication with Woo. Kantor told Plasteras that she was loyal to 1-800-Flowers, as she had advised Gallagher in an email, and that day reported Plasteras' threat to Paradine.

30.     On August 1, 2008, Kantor arrived to work at 10:00 a.m. She had worked until 8:00 p.m. the previous evening on several matters for the Chief Information Officer (the "CIO") and the IT Department. Prior to her arrival, Kantor checked her voicemail, BlackBerry, responded to emails, and called the office to inform Moeschen that she would be in shortly. However, by the time Kantor arrived, Gallagher had already left her a rude voicemail message stating it was "almost 10:00 a.m." and that she "obviously didn't care" because he had previously spoken to her about punctuality. He then stated that Kantor was prohibited from leaving at 3:00 p.m. that day, although the office was closing at that time. The defendant had a policy of closing early on Fridays from the end of June through Labor Day.

31.     Frustrated by his continued abusive treatment, Kantor went to her office and called her sister to explain what had happened. Kantor also sought out Paradine and Dinerstein to complain about Gallagher's differential treatment of her, but neither responded. Kantor left the office at approximately 6:00 p.m. that evening after successfully completing several matters for the CIO and IT department. Later, Kantor learned that another employee who was eavesdropping outside her office, apparently overhead her private conversation with her sister and believed that Kantor had negatively characterized Gallagher's conduct.

261045 v1

10

32.     The following Monday, August 4, 2008, Kantor again attempted to complain to Paradine and Dinerstein about Gallagher, but neither was available to speak to Kantor.

33.     The next day, August 5, 2008, Paradine suggested to Kantor that she meet with Gallagher and Kantor and that Paradine would probably recommend an exit strategy for Kantor because Gallagher's recollection of the series of events was different from Kantor's recollection.   Kantor reminded Paradine that Paradine was made aware of Gallagher's inappropriate conduct because Kantor had continually complained to her.   Kantor was shocked by Paradine's comment about the exit strategy and asked for some time to think about what was happening. Kantor also asked to speak directly with Jim McCann or Chris McCann since Kantor believed that Gallagher had repeatedly failed to inform them of her significant contributions to 1-800-Flowers.   Paradine refused and insisted that Kantor, Gallagher, and Paradine meet the following day.

34.     Kantor then went to Gallagher's office, but he refused to speak to her. Kantor emailed him and stated she only needed a minute, but he refused again and did not respond to her subsequent emails or voicemails.

35.     On Wednesday morning, August 6, 2008, Kantor was summoned to meet with Paradine and Gallagher.   Kantor again asked for some time to consider what was happening.  However, Gallagher had Kantor escorted out of the building.

36.     On August 7, 2008, Paradine called Kantor and told her she was fired for insubordination and that there would be no severance.

261045 v1

## FIRST CAUSE OF ACTION

### Sex Discrimination Under Title VII

37.     Plaintiff repeats and realleges paragraphs 1-36 as if fully set forth herein.

38.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of Title VII.

39.     Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress, reputational damage, and other compensable damage as a result of defendant's discriminatory acts.

40.     Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

## SECOND CAUSE OF ACTION

### Retaliation Under Title VII

41.     Plaintiff repeats and realleges paragraphs 1-40 as if fully set forth herein.

42.     By the acts and practices described above, defendant retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of Title VII.

43.     Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress, reputational damage, and other compensable damage as a result of defendant's retaliatory acts.

44.     Defendant acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

261045 v1

12

## THIRD CAUSE OF ACTION

### Discrimination Under the Executive Law

45.     Plaintiff repeats and realleges paragraphs 1-44 as if fully set forth herein.

46.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the Executive Law.

47.     Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress, reputational damage, and other compensable damage as a result of defendant's discriminatory acts.

## FOURTH CAUSE OF ACTION

### Retaliation Under the Executive Law

48.     Plaintiff repeats and realleges paragraphs 1-47 as if fully set forth herein.

49.     By the acts and practices described above, defendant retaliated against plaintiff in the terms and conditions of her employment for opposing unlawful employment practices, in violation of the Executive Law.

50.     Plaintiff is now suffering and will continue to suffer irreparable injury, emotional distress, reputational damage, and other compensable damage as a result of defendant's retaliatory acts.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court enter an award:

a.     declaring that the acts and practices complained of herein are in violation of Title VII and the Executive Law;

b.     enjoining and permanently restraining these violations of Title VII and the Executive Law;

c.     directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

d.     directing defendant to place plaintiff in the position she would have occupied but for defendant's discriminatory and retaliatory conduct and making her whole for all earnings and other benefits she would have received but for defendant's discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

e.     directing defendant to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

f.     directing defendant to pay plaintiff punitive damages as provided by Title VII;

g.     awarding plaintiff her reasonable attorneys' fees and costs;

h.     awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award; and

i.     granting such other and further relief as the Court deems necessary and proper.

261045 v1                                14

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.


Dated: New York, New York
      September 1, 2009

                         VLADECK, WALDMAN, ELIAS &
                          ENGELHARD, P.C.


By:           _____
               Debra L. Raskin
               Tara Jensen
               Attorneys for Plaintiff
               1501 Broadway, Suite 800
               New York, New York 10036
               (212) 403-7300

261045 v1